IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:11-CR-107-FL

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| v. | ) | |
| | ) | ORDER |
| EDWARD HUCKABEE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter comes before the court on defendant's motion to suppress (DE # 28). The government filed a response in opposition, and the matter was referred to United States Magistrate Judge David W. Daniel for evidentiary hearing and issuance of a memorandum and recommendation ("M&R"), pursuant to 28 U.S.C. § 636(b)(1)(B).

The magistrate judge held hearing on December 9, 2011, and entered M&R on December 22, 2011. The magistrate judge recommends denying defendant's motion to suppress. Defendant objected to the recommendation, and the government did not respond. Accordingly, the issues raised are ripe for adjudication. For the reasons that follow, the court adopts the M&R in full and denies defendant's motion to suppress.

Also before the court is defendant's motion to produce a transcript of the suppression hearing (DE # 37), filed February 23, 2012. The government informs that it does not intend to respond, and the issue is ripe for ruling. As explained below, defendant's motion is denied without prejudice.

**STATEMENT OF THE CASE**

On August 23, 2011, a grand jury returned a one-count indictment charging that defendant, having been convicted of a crime punishable by imprisonment for a term exceeding one year, did

knowingly possess in and affecting commerce, a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924. This charge stems from law enforcement's encounter with and apprehension of defendant on May 5, 2011, in Wilmington, North Carolina.

On October 28, 2011, defendant filed the instant motion to suppress. Defendant maintains that law enforcement's encounter with him constituted a Fourth Amendment seizure, that the officers did not have the reasonable suspicion required to lawfully seize him, and that all physical evidence obtained as a result, in particular the firearm, should be suppressed. The government responded in opposition on November 10, 2011, and contends that by the time defendant was seized, the officers had reasonable suspicion to stop him.

The magistrate judge held evidentiary hearing on December 9, 2011, and heard testimony from Detectives Lovell, Hunter, and Becker of the Wilmington Police Department. Thereafter, the magistrate judge issued M&R, in which he finds that no seizure occurred prior to the discovery of the firearm, and that defendant's unprovoked flight, coupled with other facts, provided reasonable suspicion for an investigatory stop. The magistrate judge therefore recommends denying defendant's motion to suppress.

On January 3, 2012, defendant filed objections to the M&R. First, defendant states that he "objects to all the factual characterizations and legal interpretations asserted by the Magistrate in his Memorandum and Recommendation." Def.'s Objections 1. Next, defendant contends that police lacked reasonable suspicion to conduct an investigatory stop during their initial encounter with him. Finally, defendant maintains that he was seized as a result of his continued encounter with the police.

The government has not responded to defendant's objections, and the time for doing so has expired.

## STATEMENT OF FACTS

After a careful review of the record in this case, the court adopts the magistrate judge's findings of fact, benefitted by evidentiary hearing, which are set forth below.[1]

> Detectives Ian Lovell, Linda Hunter, and Kenneth Becker (collectively, the "Detectives") were the sole witnesses at the evidentiary hearing, and the Court finds the following uncontested facts based on their testimony.
>
> Lovell, Hunter and Becker are detectives in the Vice and Narcotics Division of the Wilmington Police Department (the "WPD"). Detective Lovell had been a vice and narcotics detective for three years; Hunter for two years; and Becker for five years. Prior to joining vice and narcotics, Detective Lovell had four years of experience with the WPD, including assignment to a street level drug and gun unit; Hunter had 13 years of experience in various patrol units; and Becker had seven years of experience, including assignment to a street drug interdiction unit.
>
> On May 5, 2011, the Detectives were working day shift vice in an area known as "the BO" or "the Bottom." Detective Lovell was patrolling alone in an unmarked police car, and Detectives Hunter and Becker were patrolling together in a second unmarked car driven by Becker. The Detectives were familiar with the Bottom, which they characterized as an "open air drug market" known for drug activity and violence, including shootings. While the Bottom is approximately a mile from downtown Wilmington, a tourist destination, the Bottom is a low-income, residential area with only one or two small corner stores and is not frequented by tourists. Detectives Lovell, Hunter, and Becker each had made multiple arrests on the particular block in the Bottom where the events in question occurred, and their unmarked vehicles were recognized by locals in the area as police cars.
>
> At approximately 4:00 p.m., while patrolling the Bottom for drug-related criminal activity, Detective Becker noticed what appeared to be a new Chevrolet Camaro with a bar code sticker on the front window, which was indicative of a rental vehicle. Detective Becker recalled seeing the same vehicle earlier in the day across town in another area known for drug activity. Detective Becker's case report did not note

---

[1] Defendant objects to "all the factual characterizations" asserted by the magistrate judge in his M&R. However, defendant does not specify a single factual finding which he deems false or inaccurate. The court has independently reviewed the record in this case, including the audio recording of the suppression hearing, and finds no basis for coming to a different conclusion than the magistrate judge.

3

the earlier sighting of the Camaro, but he was certain that it was the same vehicle and recalled the events of that day vividly. Seeing the same rental car in two known drug areas raised Detective Becker's suspicions because, in his experience, rental cars are used by drug criminals to hide themselves, as running the tags on a rental car provides no information regarding the occupants of the vehicle. Detective Lovell also noted that rental cars are frequently used by drug traffickers in the Wilmington area in an attempt to avoid the seizure of a personal vehicle in the event of a drug-related arrest and that often a third party will rent a vehicle for the use of others. Detective Becker radioed Detective Lovell, who was approximately one block away, regarding a suspicious vehicle and asked him to run the license plate number. Detective Lovell encountered the Camaro head on, briefly made eye contact with the occupants, and turned to observe the plate number after he passed the Camaro. He then ran the number and confirmed that it was, in fact, a rental car. Detective Lovell encountered the Camaro multiple times and indicated that it appeared to be travelling in circles. Detective Lovell observed the Camaro travel south on 14th Street toward two marked police cars that were in the area on an unrelated domestic matter. The Camaro turned left onto Norman, just ahead of where the two marked police cars were parked. The Camaro slowed, pulled to the side of the street, and a passenger exited the Camaro, which then continued down Norman at a high rate of speed. Detective Lovell radioed to Detectives Hunter and Becker that an approximately six foot tall, dark complected African-American male had exited the Camaro and was walking toward 14th Street. Detective Lovell then attempted to engage the Camaro; however, due to the high rate of speed at which the Camaro was travelling, he fell several blocks behind. Detective Lovell ultimately broke off his pursuit of the Camaro upon hearing that Detective Becker was in pursuit of a suspect.

Contemporaneous with hearing Detective Lovell's admittedly vague description of the passenger, Detectives Becker and Hunter turned onto 14th Street and observed a person meeting that description, later determined to be the Defendant, walking from the direction Lovell had indicated. Detectives Hunter and Becker noticed no other people in the area except the two police officers further down 14th Street. At this point, Defendant was walking across 14th Street toward Detectives Hunter's and Becker's unmarked vehicle. Defendant made eye contact with Detective Becker, but Defendant's attention appeared to be drawn to the marked police units from which he was walking away. Defendant continued walking across 14th Street and onto the sidewalk in the direction of Detectives Becker and Hunter who were approximately one-half block away.

Detective Becker pulled to the side of the road and Detective Hunter stepped out of the unmarked police car and approached Defendant from the front. Detective Hunter was approximately five feet from Defendant and was dressed in plain clothes with badges visible both around her neck and on her belt and her weapon holstered but visible on her right side. Detective Hunter asked Defendant, in a conversational tone, if she could talk to him, and he responded by saying, "Who the [expletive

omitted] are you? You don't know me." Detective Hunter identified herself as a police detective and asked again if she could talk to him. Defendant again responded, "You don't know me," then turned and ran. The encounter between Detective Hunter and Defendant lasted for approximately five seconds.

Detective Becker exited the vehicle as Detective Hunter began to question Defendant. He moved around the back of the vehicle and approached the two from behind Detective Hunter as Defendant started to run. Both Detectives Becker and Hunter initially gave chase, but Detective Becker directed Hunter to get the car while he continued after Defendant. Detective Becker followed Defendant through a yard and encountered Defendant on the ground, caught in a large hedge row. Detective Becker observed Defendant lying on his back and reaching into his waistband. Detective Becker, believing that Defendant might be armed, drew his weapon and ordered Defendant to stop moving or he would shoot. Defendant responded that Detective Becker would have to shoot him, freed himself from the hedge, and continued to run. Detective Becker observed a firearm on the ground where Defendant had fallen and remained at that location to secure the weapon. Defendant was shortly thereafter taken into custody on 13th Street by uniformed officers.

## DISCUSSION

A.  Motion to Suppress

1.  Standard of Review

The district court reviews *de novo* only those portions of a magistrate judge's M&R to which objections are filed. 28 U.S.C. § 636(b)(1). The court does not perform a *de novo* review of those portions to which a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982). Absent a specific and timely objection, the court reviews only for "clear error," and need not give any explanation for adopting the M&R. Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir.1983). Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

5

2. Analysis

Defendant lodges two specific objections to the M&R. First, he contends that the police lacked reasonable suspicion to conduct an investigatory stop during their initial encounter with him. Defendant argues, "Since the police officers' hunch or suspicion cannot justify the initial investigatory stop, any evidence collected thereafter is excluded under the fruit of the poisonous tree doctrine." Def.'s Objections 1. Second, defendant argues that he was seized as a result of his continued encounter with the police. He maintains that a reasonable person would not have felt free to leave under the circumstances defendant faced, where multiple officers were present with their firearms and badges visible.

The Fourth Amendment to the United States Constitution guarantees the right of the people to be secure against unreasonable searches and seizures. U.S. Const. amend. IV. A police officer may approach an individual on a public street and ask questions without implicating the Fourth Amendment's protections. United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002). "[A] person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554-55 (1980); United States v. Lattimore, 87 F.3d 647, 653 (4th Cir. 1996).[2] In determining whether a reasonable person would have felt himself free to leave, courts look to a number of factors, including "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the officer's statements to others present during the encounter, the threatening presence

---

[2] See also Florida v. Bostick, 501 U.S. 429, 434 (1991) ("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required.") (internal citation and quotation marks omitted).

of several officers, the potential display of a weapon by an officer, and the physical touching by the police of the citizen." Weaver, 282 F.3d at 310.

The general rule is that a seizure "requires either physical force . . . *or,* where that is absent, *submission* to the assertion of authority." United States v. Brown, 401 F.3d 588, 594 (4th Cir. 2005) (quoting Calfornia v. Hodari D., 499 U.S. 621, 626 (1991)). "A defendant who flees the police in response to an assertion of authority has not been seized, and thus his Fourth Amendment rights are not implicated." Brown, 401 F.3d at 588.

Here, the threshold issue is whether a seizure ever occurred to trigger the protections of the Fourth Amendment. United States v. Cureton, 367 Fed. App'x 434, 437 (4th Cir. 2010) (citing Brown, 401 F.3d at 593)). Defendant does not identify the moment when he was first seized, but rather argues that "he was seized as a result of his continued encounter with the police." Def.'s Objections 1. The magistrate judge, in analyzing whether a seizure occurred, separated his analysis into two instances. First, he asked whether defendant was seized when Detective Hunter first questioned defendant by the side of the road. Next, he examines whether Detective Becker's pursuit of defendant after he took flight effected a seizure. In both instances, the magistrate judge found that the officers had not seized defendant. The court agrees.

Detective Hunter did not seize defendant when she attempted to question him near the side of the road. After Detectives Becker and Hunter pulled to the side of the road, Detective Hunter approached defendant from the front and asked, in a conversational tone, if she could talk to him. Defendant responded aggressively by saying, "Who the [expletive omitted] are you? You don't know me." Detective Hunter identified herself as a police detective and again asked if she could talk

7

to him.  Defendant again responded, "You don't know me," and then fled.  The entire encounter lasted about five seconds.

Under these factual circumstances, a reasonable person would have felt himself free to leave. Detective Hunter did not physically contact defendant, nor was her questioning of him intimidating. Her firearm was holstered, and she did not accuse defendant of any criminal activity.  Based on these circumstances, a reasonable person would have felt himself free to go about his business.  Further, even if Detective Hunter's conduct could somehow be construed as an assertion of authority, defendant never submitted.  Rather, he attempted to flee.  As stated above, "[a] defendant who flees the police in response to an assertion of authority has not been seized, and thus his Fourth Amendment rights are not implicated."  Brown, 401 F.3d at 594.

The court further finds that Detective Becker's pursuit of defendant did not amount to a seizure.  Detective Becker pursued defendant through a yard and found him on the ground, caught in a large hedge row.  Detective Becker saw defendant reaching into his waistband and, believing defendant armed, ordered him to stop moving or Becker would shoot.  But defendant was able to free himself from the hedge, and he ran away.  While Detective Becker's command to defendant – approximating "stop or I will shoot" – certainly constituted an assertion of authority, defendant again did not submit.  Accordingly, because defendant failed to submit, no seizure occurred.  See, e.g., United States v. Lender, 985 F.2d 151, 154 ("Officer Hill's show of authority in calling for the defendant to stop is not a seizure when the defendant does not yield to that authority.").

After defendant fled the hedges, Detective Becker observed a firearm on the ground where defendant had fallen.  Detective Becker remained at that location to secure the weapon.  Defendant was not seized until uniformed officers on 13th Street took him into custody.  Accordingly,

8

defendant had not been seized at the time he abandoned his firearm, and he gave up his expectation of privacy by abandoning his property during flight. Cureton, 367 Fed. App'x at 437. Therefore, the firearm was not obtained in violation of defendant's Fourth Amendment rights, and his motion to suppress is DENIED.

B.  Motion to Produce Transcript

Defendant moves the court to order production of the full transcript of the suppression hearing held on December 9, 2011. Defendant informs that the motion is "made solely for the purpose of providing Defendant with a copy of the transcript from the Motion to Suppress hearing, and is not in any way intended for purposes of delay regarding the determination of the Memorandum and Recommendation submitted to District Judge Flanagan on January 23, 2012." Def.'s Mot. 37.

Defendant's motion is DENIED without prejudice. If defendant would still seek production of the hearing transcript, defendant is DIRECTED to complete and file CJA Form 24, entitled "Authorization and Voucher for Payment of Transcript," a copy of which is attached hereto and may also be found at the following address:

http://www.uscourts.gov/FormsAndFees/Forms/CourtFormsByCategory.aspx?panel=panel5.

9

**CONCLUSION**

Upon a careful review of the M&R, the court discerns no clear error in the magistrate judge's factual findings or legal analysis, and accordingly ADOPTS the recommendation of the magistrate judge (DE # 33) as its own. Defendant's motion to suppress (DE # 23) is DENIED. Further, defendant's motion for production of transcript (DE # 37) is DENIED without prejudice.

SO ORDERED, this the 27th day of February, 2012.

_____
LOUISE W. FLANAGAN
United States District Judge

✎CJA 24 AUTHORIZATION AND VOUCHER FOR PAYMENT OF TRANSCRIPT (Rev. 01/08)

| 1. CIR./DIST./ DIV. CODE | 2. PERSON REPRESENTED | | VOUCHER NUMBER | |
|---|---|---|---|---|
| 3. MAG. DKT./DEF. NUMBER | 4. DIST. DKT./DEF. NUMBER | 5. APPEALS DKT./DEF. NUMBER | | 6. OTHER DKT. NUMBER |
| 7. IN CASE/MATTER OF *(Case Name)* | 8. PAYMENT CATEGORY<br>☐ Felony ☐ Petty Offense<br>☐ Misdemeanor ☐ Other<br>☐ Appeal | 9. TYPE PERSON REPRESENTED<br>☐ Adult Defendant ☐ Appellant<br>☐ Juvenile Defendant ☐ Appellee<br>☐ Other | | 10. REPRESENTATION TYPE<br>*(See Instructions)* |

11. OFFENSE(S) CHARGED (Cite U.S. Code, Title & Section) *If more than one offense, list (up to five) major offenses charged, according to severity of offense.*

## REQUEST AND AUTHORIZATION FOR TRANSCRIPT

12. PROCEEDING IN WHICH TRANSCRIPT IS TO BE USED *(Describe briefly)*

13. PROCEEDING TO BE TRANSCRIBED *(Describe specifically). NOTE: The trial transcripts are not to include prosecution opening statement, defense opening statement, prosecution argument, defense argument, prosecution rebuttal, voir dire or jury instructions, unless specifically authorized by the Court (see Item 14).*

14. SPECIAL AUTHORIZATIONS | JUDGE'S INITIALS
---|---
A. Apportioned Cost ____ % of transcript with *(Give case name and defendant)* |
B. ☐ 14-Day ☐ Expedited ☐ Daily ☐ Hourly ☐ Realtime Unedited |
C. ☐ Prosecution Opening Statement ☐ Prosecution Argument ☐ Prosecution Rebuttal<br>☐ Defense Opening Statement ☐ Defense Argument ☐ Voir Dire ☐ Jury Instructions |
D. In this multi-defendant case, commercial duplication of transcripts will impede the delivery of accelerated transcript services to persons proceeding under the Criminal Justice Act. |

| 15. ATTORNEY'S STATEMENT | 16. COURT ORDER |
|---|---|
| As the attorney for the person represented who is managed above, I hereby affirm that the transcript requested is necessary for adequate representation. I, therefore, request authorization to obtain the transcript services at the expense of the United States pursuant to the Criminal Justice Act.<br><br>Signature of Attorney     Date<br><br>Printed Name<br>Telephone Number: _____<br>☐ Panel Attorney ☐ Retained Attorney ☐ Pro-Se ☐ Legal Organization | Financial eligibility of the person represented having been established to the Court's satisfaction the authorization requested in Item 15 is hereby granted.<br><br><br>Signature of Presiding Judge or By Order of the Court<br><br>Date of Order     Nunc Pro Tunc Date |

## CLAIM FOR SERVICES

| 17. COURT REPORTER/TRANSCRIBER STATUS<br>☐ Official ☐ Contract ☐ Transcriber ☐ Other | 18. PAYEE'S NAME AND MAILING ADDRESS |
|---|---|
| 19. SOCIAL SECURITY NUMBER OR EMPLOYER ID NUMBER OF PAYEE | Telephone Number: _____ |

| 20. TRANSCRIPT | INCLUDE PAGE NUMBERS | NO. OF PAGES | RATE PER PAGE | SUB-TOTAL | LESS AMOUNT APPORTIONED | TOTAL |
|---|---|---|---|---|---|---|
| Original | | | | | | |
| Copy | | | | | | |
| Expense *(Itemize)* | | | | | | |
| | | | | | **TOTAL AMOUNT CLAIMED:** | |

21. CLAIMANT'S CERTIFICATION OF SERVICE PROVIDED

I hereby certify that the above claim is for services rendered and is correct, and that I have not sought or received payment *(compensation or anything of value)* from any other source for these services.

Signature of Claimant/Payee _____ Date _____

## ATTORNEY CERTIFICATION

22. CERTIFICATION OF ATTORNEY OR CLERK  I hereby certify that the services were rendered and that the transcript was received.

Signature of Attorney or Clerk _____ Date _____

## APPROVED FOR PAYMENT — COURT USE ONLY

23. APPROVED FOR PAYMENT | 24. AMOUNT APPROVED
---|---
Signature of Judge or Clerk of Court     Date |